1/10/01

```
┌─────────────────────────────┐
│      THIS DISPOSITION       │
│  IS CITABLE AS PRECEDENT    │
│       OF THE TTAB           │
└─────────────────────────────┘
```
Paper No. 17
Bottorff

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Narada Productions, Inc.
_____

Serial No. 75/460,277
Serial No. 75/977,888
_____

Mark I. Feldman and Linda Urbanik Johnson of Piper Marbury Rudnick & Wolfe for Narada Productions, Inc.

Ronald E. Aikens, Trademark Examining Attorney, Law Office 103 (Michael Szoke, Managing Attorney).
_____

Before Quinn, Walters and Bottorff, Administrative Trademark Judges.

Opinion by Bottorff, Administrative Trademark Judge:

In the two applications involved in this appeal, applicant seeks registration on the Principal Register of the mark CUBA L.A., in typed form, for, respectively, "prerecorded phonograph records and cassette tapes featuring music; prerecorded compact discs and CD-ROMs featuring music alone or coupled with images and texts related to music," in Class 9, and "entertainment services, namely, live performances by a musical band; production and

distribution services in the field of musical recordings and entertainment; recording studio services; music publishing services," in Class 41.[1]  Applicant, a Wisconsin corporation located in Milwaukee, Wisconsin, acknowledges that the designation "L.A." in its mark is the abbreviation for Los Angeles, California.  Applicant further acknowledges that the goods and services on or in connection with which it uses or intends to use its mark CUBA L.A. do not originate in or from either Cuba or Los Angeles.

The Trademark Examining Attorney has refused registration as to each of the applications on the ground that applicant's mark is primarily deceptively geographically misdescriptive of the identified goods and

---

[1] Applicant filed an intent-to-use application (Serial No. 75/460,277) on April 1, 1998 covering both the Class 9 goods and the Class 41 services.  On September 14, 1998, applicant filed an Amendment to Allege Use covering the Class 41 services only.  At applicant's request, the application was divided on October 15, 1998.  The parent application is Serial No. 75/460,277, which covers the Class 9 goods and which remains an intent-to-use application.  The child application is Serial No. 75/977,888, which covers the Class 41 services and which, in view of the filing and acceptance of the Amendment to Allege Use, is now a use-based application.  Because the ground for refusal, the evidence of record and the issues to be decided on appeal are the same in each of the applications, we are consolidating the two applications for purposes of this appeal, and shall decide both appeals in this single decision.

services.  See Trademark Act Section 2(e)(3), 15 U.S.C.

§1052(e)(3).[2]

When the refusals were made final, applicant filed

these appeals.  Applicant and the Trademark Examining

Attorney filed main briefs on appeal in each application,

and applicant filed a reply brief in Serial No. 75/460,277.[3]

No oral hearing was requested.

In reaching our decision herein, we have carefully

considered all of the evidence of record and all of the

arguments presented by the Trademark Examining Attorney and

by applicant's counsel, including any evidence and/or

arguments not specifically mentioned in this opinion.

It is settled that:

> [w]hether a mark is primarily geographically
> deceptively misdescriptive … requires an
> analysis under a two prong test to establish
> (1) whether the primary significance of the
> mark as it is used is a generally known

---

[2] Trademark Act Section 1052(e)(3) provides as follows:

> No trademark by which the goods of the applicant may be
> distinguished from the goods of others shall be refused
> registration on the principal register on account of its
> nature unless it –
>
> (e) Consists of a mark which, … (3) when used on or in
> connection with the goods of the applicant is primarily
> geographically deceptively misdescriptive of them …

[3] There is no reply brief of record in application Serial No.
75/977,888.  However, we have considered applicant's single reply
brief in connection with both of the applications involved in
this appeal.

geographic place; and (2) whether the public would make a "goods [and/or services]/place association," i.e., believe that the goods [and/or services] for which the mark is sought to be registered originate in that place.

*Institut National Des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574, 22 USPQ2d 1190, 1195 (Fed. Cir. 1992). *See also In re Nantucket, Inc.,* 677 F.2d 95, 213 USPQ 889 (CCPA 1982). If these two prongs are satisfied, and if, as in the present case, the applicant's goods and services do not in fact originate from the place named in the mark, refusal under Section 2(e)(3) is proper. *See In re Loew's Theatres, Inc.*, 769 F.2d 764, 226 USPQ 865 (Fed. Cir. 1985).

With respect to the first prong of the Section 2(e)(3) test, applicant contends that the primary significance of its mark cannot be that of a generally known geographic place because there is no such place as CUBA L.A. "Cuba is a place, L.A. is a place, but there is no such place as CUBA L.A. CUBA L.A. simply does not exist." (Brief, at 6.) Instead, applicant argues, CUBA L.A. is an incongruous and arbitrary combination of unrelated geographic locations which, when viewed as a whole, has no geographic significance, but which rather is evocative or suggestive of the style of music featured in applicant's goods and

4

services.  For his part, the Trademark Examining Attorney argues essentially that CUBA and L.A. each are well-known geographic locations and that applicant's mere combining of the two in its mark does not negate the primarily geographic significance of either, nor does it result in a composite which is not of primarily geographic significance.

Both the Trademark Examining Attorney and applicant cite to the Board's decision in *In re London & Edinburgh Insurance Group Ltd.,* 36 USPQ2d 1367 (TTAB 1995).  The issue in that case was whether the mark LONDON & EDINBURGH INSURANCE was primarily geographically descriptive, under Trademark Act Section 2(e)(2), of the applicant's insurance underwriting services, which the applicant rendered in and from London, England and Edinburgh, Scotland.  The Board noted that the case presented a question of first impression for the Board, namely, whether a mark comprising a combination of two geographic terms was primarily geographically descriptive.  We are faced with essentially the same question in the present case, albeit in the context of a Section 2(e)(3) refusal rather than a Section 2(e)(2) refusal.

Ser. Nos. 75/460,277 and 75/977,888

In *In re London & Edinburgh, supra,* the Board discussed the issue of whether the primary significance of the applicant's mark was geographic:

> As noted above, the basis for applicant's position is that when combined in the phrase LONDON & EDINBURGH, the individual geographic terms become nongeographic because London & Edinburgh is not the name of a particular geographic place. We disagree. When the mark is viewed as a whole, the geographic significance of the words is not lost. Consumers will still regard the mark as referring to the cities of London and Edinburgh, rather than to some mythical place called "London & Edinburgh." Nor can London & Edinburgh be considered such an odd or incongruous combination of geographic place names that consumers will view it as an arbitrary combination without a geographic significance to the whole, in the way that, perhaps, "Borneo & Bulgaria" might be. London and Edinburgh are, respectively, the capitals of England and Scotland, and these two bordering countries are, in turn, part of the United Kingdom. Because of the natural association between these two capital cities of the United Kingdom, and their geographical proximity, consumers are likely to view the phrase London & Edinburgh as having a geographic significance. In the context of a mark used for insurance underwriting services, that significance will be of services which are rendered in or originate from both of these cities.

36 USPQ2d at 1369.

We are not persuaded by applicant's argument that because CUBA L.A. is not the name of an actual geographic place, the primary significance of the mark cannot be

6

geographic under the first prong of the Section 2(e)(3) test.  As in the *London & Edinburgh* case, we find that purchasers would understand applicant's mark to be referring to the two places named in the mark, rather than to some mythical place called "Cuba L.A."  Nor are we persuaded that the absence of an ampersand in applicant's mark is of any legal consequence; the Board's finding in *London & Edinburgh* did not rest on the existence of the ampersand in the LONDON & EDINBURGH mark.

Likewise, we are not persuaded by applicant's argument that CUBA L.A., like the "Borneo & Bulgaria" hypothetical set out by the Board in *London & Edinburgh*, is a combination of locations which is so arbitrary, incongruous and random that the primarily geographic significance of the mark as a whole is negated.  It is true that Cuba and L.A. do not share between themselves the same sort of geographical proximity and governmental connections as those which the Board cited in support of its finding that purchasers of insurance services would make a "natural association" between London and Edinburgh.  However, we cannot conclude that Cuba and L.A., in terms of their relationship to each other and to applicant's identified goods and services, are as disparate and unrelated as Borneo and Bulgaria are, or that the association between

7

Cuba and L.A. is as fanciful and random as an association between Borneo and Bulgaria would be.

Rather, we find that the primary significance of CUBA L.A., when used as a mark in connection with applicant's musical goods and services, would be that the goods and services are rendered in or originate from both of the locations identified in the mark. That is, purchasers could reasonably assume from the mark that, for example, applicant's goods and services involve music from Cuba which is performed, recorded or distributed in and/or from L.A., or that the goods and services involve musicians from Cuba who perform in, or are based in, L.A. Thus, purchasers would not necessarily perceive anything incongruous or fanciful in the combining of "Cuba" with "L.A." in a mark for such goods and services, and the mark's combination of these two place names does not detract from the primarily geographic significance of the mark as a whole. CUBA L.A., for applicant's goods and services, is more akin to LONDON & EDINBURGH for insurance services than it is to a truly random combination like "Borneo & Bulgaria."

Finally, we are not persuaded by applicant's argument that the primary significance of CUBA L.A. is that it is suggestive or evocative of the style of music featured in

8

applicant's goods and services. Applicant has presented no evidence that there is a recognized genre or style of music known as "Cuba L.A.," such that the designation CUBA L.A. would be seen primarily as identifying such style of music rather than the geographic origin of applicant's goods and services. *See In re Wada*, 194 F.3d 1297, 52 USPQ2d 1539 (Fed. Cir. 1999), *aff'g* 48 USPQ2d 1689 (TTAB 1998)(no evidence of a "New York style" of the leather goods at issue); *In re Bacardi & Co. Ltd.,* 48 USPQ2d 1031 (TTAB 1998)(no evidence that primary significance of HAVANA (as applied to alcoholic beverages) is that of "pre-Castro free-wheeling lifestyle" rather than that of geographic location). *Compare In re The Fred Gretsch Company, Inc.*, 159 USPQ 60 (TTAB 1968)(NASHVILLE suggestive of style of country and western music, and thus not primarily geographically deceptively misdescriptive of guitars made in New York); *but see In re Opryland USA Inc.*, 1 USPQ2d 1409 (TTAB 1986)(THE NASHVILLE NETWORK primarily geographically descriptive of television program production and distribution).

In sum, we find that the primary significance of applicant's mark CUBA L.A. is geographic. The mark is composed of the names of two well-known geographic

9

locations which are neither obscure nor remote.[4] The mere combination of those two names into the composite CUBA L.A. does not detract from the primarily geographic significance of each of the place names nor from the primarily geographic significance of the mark as a whole. We find that the Trademark Examining Attorney has established, prima facie, the first prong of his Section 2(e)(3) refusal, and that applicant has failed to rebut that prima facie showing by proving that the primary significance of the mark is other than that of the geographic places named in the mark.[5] *See In re London & Edinburgh Insurance Group Ltd., supra.*

---

[4] See, e.g., applicant's brief at 8: "Likewise, Cuba and L.A., individually, represent well-known locations…"

[5] Applicant cites various cases wherein it was found that the primary significance of the marks at issue was not geographic, i.e., *In re International Taste, Inc.*, 53 USPQ2d 1604 (TTAB 2000)(HOLLYWOOD FRIES); *In re Urbano*, 51 USPQ2d 1776 (TTAB 1999) (SYDNEY 2000); *In re Municipal Capital Markets Corp*., 51 USPQ2d 1369 (TTAB 1999)(COOPERSTOWN); *Forschner Group v. Arrow Trading Co.*, 30 F.3d 348, 31 USPQ2d 1614 (2nd Cir. 1994)(SWISS ARMY KNIFE); *In re Sharkey's Dry Goods Co*., 23 USPQ2d 1061 (TTAB 1992)(PARIS BEACH CLUB); and *In re The Fred Gretsch Company, Inc., supr*a (NASHVILLE). However, those cases are distinguishable from the present case. Applicant's mark is not incongruous or fanciful like PARIS BEACH CLUB, nor is it of no geographic significance like SWISS ARMY KNIFE. Likewise, the places named in applicant's mark do not have a non-geographic significance which outweighs their geographic significance, as was found with respect to HOLLYWOOD (refers primarily to the movie industry), COOPERSTOWN (refers primarily to the Baseball Hall of Fame), SYDNEY 2000 (refers primarily to the 2000 Olympic Games), and NASHVILLE (refers to a style of country and western music). Applicant has not persuasively shown that CUBA L.A. even

We turn next to the second prong of the Section 2(e)(3) test, i.e., whether a goods/place and services/place association exists between applicant's goods and services and the places named in the mark. Initially, we reject applicant's argument that there can be no goods/place or services/place association because the mark does not identify a particular, single place. As discussed above, the primary significance of the mark would be that of two well-known geographic locations, Cuba and L.A., rather than that of a mythical place called "Cuba L.A." The issue to be decided is whether purchasers would associate those places with the identified goods and services. *See In re London & Edinburgh Insurance Group Ltd., supra,* 36 USPQ2d at 1369-70.

We find that purchasers would make an association between Cuba and the goods and services identified in applicant's applications. Notwithstanding the existence of the United States embargo on trade with Cuba, it appears from the record that purchasers reasonably could assume that music-related goods and services of Cuban origin are available in the United States, including compact discs and live performances such as those identified in applicant's

---

has a non-geographic significance, much less that any such non-geographic significance is its primary significance.

applications.  The Trademark Examining Attorney has submitted excerpts of articles from the NEXIS® database which include the following:

> BEST OF MIAMI '98: SHOPS AND WARES – Don't worry, buying Cuban CDs is perfectly legal in the United States – and in Miami, too. Although a lot of stores around town carry a decent selection of new releases from the island these days no place has more than the music counters within Marazul's three travel agencies.  As the U.S. distributor for Cuba's Bis Music, Marazul gets the latest CDs recorded on the island right from the source.  Whether it's son, nueva trova, Cuban salsa, filin, or Cuban jazz, you'll find it at Marazul.  (Miami New Times, May 14, 1998.)

> Even Cuban-based bands now reflect the influence of American contemporary jazz and pop, as heard in the recent Los Angeles appearances of Cuba-based charanga ensemble Los Van Van and other bands.  (Los Angeles Times, May 24, 1999.)

> Cuba Connection: the well-deserved recent excitement over Cuban music and musicians coming to Los Angeles reminds us of the Cubans in our midst.  (Los Angeles Times, June 26, 1998.)

> Some of the worlds' finest musicians will participate in the Massachusetts International Festival of the Arts.  Highlights include: Three days of popular and classical music from Cuba featuring Camerata Romeu, Jose Maria Vitier, La Charanga Habanera, Isaac Delgado and Gema Cuatro.  (The Boston Herald, April 12, 1998.)

> SUNFEST'S BIG WEEKEND; Cuban Band Seeks Sounds of Welcome, but Florida-Based Anti-Castro Factions are Protesting Cubanismo!'s

Appearance. (The Palm Beach Post, April 30,
1999.)

CUBAN SINGER GETS RARE WELCOME IN S. FLORIDA -
… Aficionados of contemporary Cuban music said
it is important to stage such events in Miami-
Dade because it helps send a message to the
governments of the United States and Cuba that
people in both countries are eager to separate
music from politics. (Sun-Sentinel (Ft.
Lauderdale, FL), April 22, 1998.)

Music lovers have long bemoaned that the best
of Cuba's contemporary musicians are now
touring the United States, but there's little
chance they will appear in or near Miami.  That
restrictive atmosphere could be easing.  At 9
tonight, Onyx, a South Beach hotspot, will
present popular Cuba headliner Isaac Delgado
and his 19-piece band.  (Sun-Sentinel (Ft.
Lauderdale, FL), April 21, 1998.)

CHURNING COMPLEXITY FROM RARE CUBAN VISITORS -
… And Los Van Van aren't just any group.
Formed in 1969 by Mr. Formell, the band has
consistently been the best dance band in Cuba.
Because of the United States Government's
blockade, the group has developed, like much of
Cuban music, out of the earshot of the United
States, and salsa here and in Puerto Rico has
developed in a radically different way.
Hearing Los Van Van is like running across your
own identical twin who had been taken away at
birth and… (The New York Times, December 16,
1996.)


Applicant argues that the Trademark Examining

Attorney's evidence fails to show that Cuban music is "well

known and famous among purchasers," inasmuch as "none of

the articles points to widespread recognition and/or

industry purchasing statistics."  Citing In re Venice Maid

13

*Co., Inc.*, 222 USPQ 618 (TTAB 1984), applicant further

argues that "Cuba is no more famous for its music than any

other country," and that the Trademark Examining Attorney's

evidence

> merely substantiates the existence of Cuban
> music generally, like the existence of Russian
> music or Greek music. Clearly, every country
> will have its own culture, which likely
> includes some form of music. However, that
> does not mean that the particular country's
> music has attained enough notoriety that
> purchasers will connect a particular album to a
> particular country based on the trademark. *See
> In re Venice Maid,* 222 U.S.P.Q. at 619. A
> decision to the contrary may create a slippery
> slope that could, conceivably, preclude the use
> of certain terms in almost any mark.

(Brief at 11.)

However, to establish the requisite goods/place and

services/place associations, the Trademark Examining

Attorney is not required to prove that Cuba is famous or

well-known for the goods and services at issue. *See In re

Nantucket, supra,* 213 USPQ at 898 (Neis, Judge,

concurring); *In re Handler Fenton Westerns, Inc.*, 214 USPQ

848 (TTAB 1982).[6] Furthermore, in this case, unlike in the

---

[6] Moreover, we note that certain of the evidence of record would
support a finding that Cuba is, in fact, noted for its music.
See, e.g., the following NEXIS® excerpts in the record:

> Will you buy the experts' contention that the United
> States, Cuba and Brazil are the three countries that
> contribute most to the evolution of today's popular

14

*Venice Maid* case, there is sufficient evidence in the record to establish that the particular types of goods and services identified in the applications would be known or assumed to originate in or from the place named in the mark.  The Trademark Examining Attorney has done more than merely "substantiate[] the existence of Cuban music generally."

We also find that the requisite goods/place and services/place association exists between the goods and services identified in applicant's applications and the other place named in applicant's mark, i.e., "L.A." or Los Angeles.  Applicant admits "that people generally recognize L.A. as an arts and entertainment mecca."  (Brief, at 11-12.)  Moreover, the Trademark Examining Attorney has submitted an Internet search printout which includes listings and synopses of web sites involving the music

---

music?  (<u>Chattanooga Times and Free Press</u>, May 10, 1999.)

The cha-cha-cha, mambo, rumba and salsa all began in Cuba before captivating dancers in the United States, Africa and elsewhere.  (<u>Newsday</u>, October 31, 1993.)

See also the Trademark Examining Attorney's Internet search printout which includes, in its listing and synopses of web sites involving Cuban music, the following excerpt from an online music catalog: "The island that gave the world the rumba, the mambo, the chachacha, the danzon and the habanera.  Forget sugar, cigars, and rum[,] music is Cuba's greatest export."

industry in Los Angeles, including those covering the L.A.

Opera, various rock/pop bands and independent artists

located in L.A., music production companies and record

labels located in L.A., and L.A. venues for live musical

performances.  This evidence suffices to establish, prima

facie, that purchasers would reasonably assume that music-

related goods and services of the types identified in

applicant's applications can and do originate in and from

Los Angeles.

Applicant argues, however, that in view of the fact

that numerous musical styles and genres could be associated

with Los Angeles, the Trademark Examining Attorney has

failed to prove

> that a purchaser would associate any particular
> music with L.A. … Merely stating that many
> people recognize L.A. as a city known for arts
> and entertainment does not establish that
> people would associate these particular
> goods/services with L.A. … The evidence does
> not establish that a reasonable, mainstream
> consumer associates Applicant's style of music
> with L.A. any more so than a consumer would
> associate the music with Canada, China, Puerto
> Rico or any other country.

(Brief, at 12.)  Similarly, applicant argues that

> the type of music identified by the Mark does
> not exist in one particular region.  It
> consists of an amalgamation of unique styles,
> primarily from Cuba or Cuban in style or

16

> rhythm, but, in combination with other styles that make the sound distinctive. Therefore, a purchaser would have no reasonable basis to mistakenly believe that the goods/services are connected with a generally known geographic location.

(Brief, at 1-2.)

Applicant's argument that there is no connection between L.A. and applicant's <u>particular</u> style of music is not persuasive. The Board rejected a similar argument in *In re Midwest Nut & Seed Company, Inc.*, 214 USPQ 852 (TTAB 1982), wherein the applicant sought to register CALIFORNIA MIX for goods identified in the application as "mixtures of dried fruits and nut meats." In finding a goods/place association between California and the goods identified in the application, the Board relied on the fact that purchasers associated California with fruits and nuts generally, and rejected as irrelevant the fact that applicant's <u>actual</u> goods consisted largely of fruits and nuts which would not be assumed to have originated in California, such as bananas, pineapples, Brazil nuts and Mexican pumpkin seeds. Likewise, because there exists an association between music, generally, and Los Angeles, and because the identifications of goods and services in applicant's applications are not limited in any way as to musical style or genre, applicant's contention that there

17

is no association between Los Angeles and applicant's particular style of music is unavailing.

Moreover, even if applicant's identifications of goods and services had been limited in such a way as to cover only applicant's particular "Cuban style" of music, we would find that the requisite goods/place and services/place associations between applicant's goods and services and Los Angeles exist. If, as applicant contends, purchasers are aware that Los Angeles is the origin of goods and services involving a wide variety of different musical styles and genres, it stands to reason that purchasers could logically assume that goods and services involving applicant's particular "Cuban-style" music likewise have their origin in Los Angeles. We note that applicant's own specimens state that Los Angeles is one of the top twenty SoundScan markets for Cuban music in the United States, and we further are persuaded by the Trademark Examining Attorney's suggestion (unchallenged in applicant's reply brief) that, because Los Angeles is named first in the specimen's listing of the top twenty markets for Cuban music such as applicant's, Los Angeles is in fact

18

the top market for such music.[7]

In sum, we find that the Trademark Examining Attorney has established, prima facie, the existence of a goods/place association and a services/place association between applicant's goods and services, as identified in the applications, and the places named in applicant's mark, Cuba and L.A. We further find that applicant has not rebutted the Trademark Examining Attorney's prima facie showing on this second prong of the Section 2(e)(3) test.[8]

For the reasons discussed above, we find that the primary significance of applicant's mark is that of the names of two well-known geographic places, Cuba and L.A., and that applicant's combination of those two place names into the composite CUBA L.A. does not detract from the

---

[7] The specimen states:

**Top 20 SoundScan markets for Cuban music**
Los Angeles • New York • San Francisco • Miami • Boston • Philadelphia • Chicago • Washington, D.C. • Portland • Seattle • Minneapolis • San Diego • Denver • Austin • Detroit • Houston • Tucson • Albuquerque • Baltimore • Atlanta

[8] We further note that applicant's reply brief arguments (at pp. 4-5) with regard to the second prong of the Section 2(e)(3) test are particularly unpersuasive. It is irrelevant that the geographic origin of applicant's goods and services might not be material to purchasers, or that applicant's mark does not misrepresent the style or genre of music featured in applicant's goods and services. Those questions of "materiality to the purchasing decision" would be germane if the Trademark Examining Attorney's refusal were based on the ground of "deceptiveness" under Trademark Act Section 2(a), but they are not germane to the Section 2(e)(3) refusals at issue in this case.

primarily geographic significance of the mark.  We further find that a goods/place association and services/place association exists between applicant's goods and services, as identified in the applications, and the places named in the mark, Cuba and L.A.  Because applicant's goods and services do not originate in or from Cuba and/or L.A., we conclude that applicant's mark is primarily geographically deceptively misdescriptive of applicant's goods and services, under Trademark Act Section 2(e)(3).

**Decision**:  The refusal to register is affirmed in each of the applications.